and Stanley Black & Decker as Intervenors, 2022-1649. Mr. Hutchins. Thank you and good morning, Your Honor, and may it please the Court. I'd like to discuss DI and time-willing some patent invalidity issues, and we'll rely on our briefing for any other issues. With respect to DI and specifically apportioning expenses to the DI products, we submit the Commission made two errors. First, the Commission erred in adopting an inflexible rule that per se disallows proof of investments collectively for products covered by various of the asserted patents in an overlapping fashion where the overlap is less than 100%. The Commission's prior decision in DRAMS, the 242 investigation, allowed the complainant to prove a domestic industry by demonstrating investment collectively in a series of products. Now, in that case, it was DRAMS of various sizes. Even though each patent in that case did not cover each size of DRAM, but because of the substantial overlap among the patent coverage and products, the Commission held that there was a DI proven, even though the evidence was not broken down by the individual sizes of DRAM. Here, we submit the Commission likewise should have considered the amount of overlap and taken the flexible approach of the DRAMS case instead of propounding a rule that would cause a complainant's evidence of DI to fail whenever a single product in the aggregation was covered by less than all of the asserted patents. Show me where the Commission adopted the rigid rule that you say, and you've just tried to articulate. When the Commission stated that our aggregation was improper because it covered products collectively where not all of the products were covered by all of the patents, and when the Commission further stated, and I take issue with their description of the record, but when the Commission further stated that they had to reject the DI aggregation because you could not tell whether one of the excluded products for one of the patents accounted for 90% of the revenue or 10% or vice versa. In other words, that it couldn't tell whether any of the excluded products would have had such a high allocation that it would prevent any of the three patents from having a DI that could have been significant. That logic would apply to the case, for instance, where you have a complainant that has 50 DI products, and the complainant asserts that all 50 products are covered by all asserted patents, and they aggregate their DI evidence accordingly. Everyone in the court here would agree today that if that supposition were true and all of the asserted patents actually covered all of the DI products, that's an appropriate aggregation. But assume the ALJ determines for whatever reason that one of those products isn't covered by one of the patents, and a different one of those products isn't covered by a different product. The patents don't quite overlap. Under the logic of the Commission's decision here, that DI evidence would be thrown out as irrelevant because the Commission couldn't know whether the absent product, whether it was this product for this patent or this different product for this other patent, had such a high allocation that it would have prevented a DI for any of the individual patents. Counsel, at appendix page 6, the Commission said, of the 57 products, only 14 practice all three of the patents. Fourteen practicing all three of the patents means something. You're not particularly arguing that. We don't disagree, by the way, with the Venn diagram that's included in A60. We have three DI products. For the three patents, there are 14 products that cover all three. For the 771 and the 185 patents, the overlap is much more significant. It's more than two-thirds overlap. We submit that the Commission should have undertaken to determine whether that overlap was significant enough for either of those under the DRAMS case to treat it as effectively one product, which is what the DRAMS case did with the various sizes of DRAMS. I'll also say this, importantly. The Commission should have, if it were going to what we say is a diversion from the DRAMS case, looked to the underlying product-by-product, year-by-year data, which absolutely was in the record, and look at whether the sum of the revenues for the products that cover the 771 patents specifically, the DI products that cover the 185 patents specifically, the products that cover the 662 patents specifically. On a product-by-product basis, it was in the record which products are covered by which patents, and for every single individual DI product in Complainant's Exhibit 28C, there was a spreadsheet that listed what the revenues were per year, per product. If the court were going to institute a rule that we submit is more stringent than DRAMS suggests, it should have looked to the data, because it doesn't take an expert, I would submit, to simply add the revenues. If it's determined that these 30 of the 50 products are covered by one patent... Did you argue the case that way to either the ALJ or to the Commission? Focusing on the specific product-by-product revenues? To the ALJ, the aggregation was done for the DI products in its entirety. If you were to look at the experts' aggregation, the expert did not sum the products in that fashion. The underlying data, that spreadsheet that I just referenced, the 28C Exhibit, was cited repeatedly to the Commission during the appeal. Did you make the specific explicit argument, though, even to the Commission, that they should focus on each product, or they should focus on a particular product and look at the sales for that particular product? We pointed out... What I can say is we provided the data to the Commission, and we pointed out to the Commission that you can determine from that data any aggregation you want. The best sites I could provide you... We've all seen how sizable the records are in Commission cases, and indeed we have a pretty substantial portion of that here. So I'm not sure that you can expect the Commission to have gone through the record with the kind of specificity that you're talking about if you're not actually making the argument that that's the focus of your contention, even setting aside the question of whether you raised it to the ALJ. The best sites I can give you to the Commission would be at A4423 and 4432, but it's cited throughout the discussion. I'll note that... What was the citation to that? 4423 and 4432. All right. And I'll note that, for instance, in the Laser Barcode Scanners case, the court, after it had done its DI analysis, the court recognized that the technical prong only ended up being met for one claim of one patent. There the Commission went back on its own to look at the underlying data to come to a conclusion that there was DI for that lesser subset of what had been argued before, which would alleviate some of the unfairness or a trap for the unwary for the complainant, because no complainant can present all permutations that are possible if they have a lot of DI products. Counsel, we don't have to deal with this issue at all, do we? Because you've got obviousness invalidations, and you're apparently not arguing those, and you're relying on your briefs. But, in fact, we don't have to deal with the economic issue, do we? Either would be an independent ground. So we have to win on DI, and we have to win for each of the patents on the obviousness. With respect to the 662 patent, the auto-recalibration patent, our argument is that the Commission erred by accepting a ruling of obviousness that we suggest was based on improper hindsight reconstruction. One, we submit that the secondary references are not in the field of the patent, based on the description of the field and the patent itself and the scope of the claims. But also, the manner in which calibration is done, for instance, in the German application, is not in the same way as the auto-recalibration that they're trying to create in Stieber, which is the moving stud sensor. Because in the German application, it's a stationary sensor on a tank or a silo that's holding liquid or grain, for instance. And you do an initial calibration. You empty the tank completely. You fill the tank completely. Then the calibration is set for the remainder of the normal operation of the sensor. That's not a recalibration. That's simply a calibration that's done. And that description in the application is paragraphs 86 and 87 at A17338. That single initial calibration is not an automatic recalibration we submit. So that even if you were to apply this learning process of emptying a tank and filling a tank, it would not be an improvement in the same way. Similarly for Miller, which explicitly cannot and does not detect studs, it would not be an improvement in the same way. And Miller was before the patent office. So you're into your bottle time. You can either use it or continue as you choose. I'll continue just to make one small point with respect to validity on the other two patents, the 771 and 185. We submit that simply by looking at the product, the prior Zircon 1 product in the record, which can be seen at A17814. You will see the vertical elongated indentations on either side, which hold the thumb vertically, and it's always shown in the manual as being held vertically, and you have multiple fingers on the other side in the indentation, which that, in our view, would prevent there being an axis of rotation, because on neither side do you have a single point. The axis is an imaginary line with points on either side. In neither instance, because the thumb is held vertically and it's against the wall, and because you have multiple fingers on the other side, you do not have that single point for an axis of rotation. And we submit that the prior reference in that respect speaks for itself, and so your honors can simply look at the reference and come to a conclusion as to whether it's anticipating the axis of rotation claim. Thank you very much. Mr. Richards for commission. Thank you, your honor. Your honors, may it please the court. This is an investigation where the commission's no violation determination is an unremarkable application of settled law to evidence, and it should be affirmed for two independent reasons. The first reason, as you've touched on sort of at length already, is the domestic industry issue. There are three asserted patents in this case. The domestic industry has to be shown as to each of them, and by statutory requirement, it has to be relating to articles protected by the patent. If they had proceeded only with respect to one patent, wouldn't they have proved the domestic industry? We don't know the answer to that, your honor. That is precisely the nub of the commission's opinion. It's that the evidence before it isn't sufficient for it to make the significance analysis. I will note that the former prior commission opinions would suggest the answer to that would be yes, not assuming that the group of products was a tightly related group. If the group of products are articles that are protected by the patent, and there was a single patented issue, and the approach of relying on those articles and investments of them, that would be an appropriate approach. I do want to go ahead and launch into some responses to the points we just heard. The first is about the D-RAMS case. Importantly, I think what's been missed here, D-RAMS applied the pre-1988 version of the Tariff Act. The significance is there, the 1988 amendments to the Tariff Act is when the language, articles protected by the patent, was put into the statute. The commission alluded to this in their opinion when it noted, it wasn't sure that the pre-1987 decision in D-RAMS was really applicable here. Even if it was, they did actually go ahead and make the finding that there wasn't substantial overlap here, versus what was the factual situation in D-RAMS, where you had different D-RAMS chips, essentially of 8 kilobytes, 16 kilobytes, 32 kilobytes. Those were the groupings. By contrast, it pointed again to that Venn diagram and said, here, 53 products total, but the overlap for all the patents is only 14 of those products. It said that's not substantial overlap. I think the D-RAMS reliance fails for two different reasons. There's no support for the substantial overlap factually. Legally, there's no indication that the commission in 1987 was applying language from an amendment that wasn't going to exist for another year. One of the arguments, and maybe you're about to come to it, is that the commission applied a very rigid rule, a very narrow interpretation of what needs to be shown in order to prove domestic industry when there's some degree of overlap in the products and the patents. Did the commission, in fact, do that? No, Your Honor. The commission has been clear that there are many ways that a DI can be proved. I'll also point out the suggestion that this case is where the rule that was applied here was laid out isn't correct. In my research, it goes back at least to 2004 in the commission's digital to analog converters case. That was the one where the commission said, because complainant is asserting the 928 patent and the 501 patent and the articles that practice said patents don't overlap, complainant must demonstrate the existence of two domestic industries. So when you said this is a straightforward application of settled law, did you mean commission decisions? Yes. Do we have any Federal Circuit cases on this point? Well, I'll note, Your Honor, this particular exact fact situation, I haven't seen in a Federal Circuit case. I think the closest one you can find will be the interdigital opinion, which states repeatedly that the domestic industry has to be relating to articles that practice the patent. That's really the guiding light here behind the commission's opinion, and for good reason, because that is the statutory language that it cannot abandon. But we haven't adopted the patent-by-patent requirement in any decision of ours. Is that right? No, and I need to be very careful. The commission has not said, and it is not the commission's position, that there has to be a patent-by-patent allocation in every case. The commission will accept articles, an article-by-article allocation, where appropriate. It will accept a patent-by-patent allocation, if that's the way the complainants want to prove their case. It could be article-by-article as well. Right, and in that situation, the way you'd get to the articles that are protected by the patent portion of the statute is by showing the articles are protected by the patent. But didn't the commission conclude that 14 products practice all three patents? That's correct, Your Honor, but that's not enough. The problem is... What, you need 15 or 20? No, no, it's not simply the number. Well, wouldn't one do it? I'm sorry? Wouldn't one do it? Absolutely. One product could be enough if there's evidence presented in the record showing that the investments in that one product are significant and substantial and assuming that that product is protected by the patent. That's what's missing here. Instead of getting the information so that we could suss out how much was invested in the products that are protected by each patent, we got it aggregated. Hutchins says that the materials before the commission, at least, and I guess it was before the ALJ, broke these numbers down by product. So I'll make a couple points. I respectfully disagree with my friend. You disagree that there was anything in the record that had that kind of breakdown, or you disagree that that's a sufficient basis for his getting relief? No, I disagree about what was presented to the ALJ and what was presented to the commission. Okay. I'll note first the reference to Appendix 4423 and 4432. I attempted to look up at counsel's table, but neither of those are in the appendix. I checked with intervener's counsel as well, so I can't comment on those because they weren't designated in the appendix. Well, the fact that they're not in the appendix doesn't mean they're not in the record. Well, I can go on beyond that. Can you answer the question that he raises, which is, was the breakdown type evidence before the commission? Was there evidence from which the commission, if it had gotten out its pencil, could have added up the numbers and come to a conclusion with respect to the particular products, let's say, that were within the middle of the Venn diagram? I submit no, Your Honor. The two things I'm aware of that are in the record, there is this declaration from Mr. Bork. That is not substantive evidence. It was never admitted as evidence. In fact, it was the subject of a motion in Limine, which Zercon represented to the ALJ that it would not rely on it as substantive evidence. Well, okay. Disregard Bork. What I'm really going for is, is there a spreadsheet or some equivalent in which, had the commission dived in, you can query whether the commission had an obligation to dive in if it wasn't specifically briefed to them, but the commission could have elicited the information necessary to establish that, let's say, those 14 products, all of which were covered by all the patents, constituted a domestic industry for purposes of the statute. No. And may I explain? Yes. I want to make sure my representation is correct. I have dove in into the record. I know the spreadsheets that we are talking about. It is not so clear as comparing the list of product names to these spreadsheets. I didn't see the product names in the columns. There are a lot of numbers about expenditures, but to the extent the assertion is that they are readily discernible, without any testimony explaining how to do this calculation, I disagree with that. And the second point I wanted to make is the commission, as opposed to myself preparing for this argument, was never pointed to those and asked to do that. So whether the commission could have done it, it was never even asked to. Does those responses cover what counsel is referring to as 28C? I'm sorry. I didn't catch the reference to 28C, I'm afraid. I thought that's what counsel was referring to, which I took to be some exhibit that he contends is in the record. I don't know if he means the administrative record or the evidentiary record. I apologize, Your Honor. I'm not sure what the reference to 28C is. Oh, I'm sorry. I see my time has expired. Yes, that's what happens when one divides one's time. Yes, indeed. Your Honors, absent more questions, I'll go ahead and sit down. Thank you. Mr. Collins. Thank you, Your Honors. May it please the Court. I guess I'll start off with clearing up some of the confusion on Exhibit 28C. Exhibit 28CX28, it's in the record at 6564. It's a summary chart of revenue. So using a revenue chart is the wrong thing here because what's trying to be identified is the allocation of expenses, investments in the DI products, to determine whether those investments are significant and substantial. What's missing is a chart showing the investments, the expenses on a product-by-product thing. So saying that there's revenue charts, that someone at the Commission could have taken a calculator out and done all the addition, that doesn't get you anywhere anyway because this is not about the investment expenses. So that chart does not really push the needle at all. Is 28C in the evidentiary record in any event? Do you know? Honestly, off the top of my head, I am not sure. It was in the appendix. That I know, but I'm not sure. And I know we have issues about what is and is not in the evidentiary record. But I just wanted to make it clear, no confusion. Revenue and expenses, not the same thing. The second point, I think, Judge Stark, you asked about whether they asked them where in the record was a rigid rule identified, and the answer is it's not. If you look at the Commission's opinion on pages 61 and 62, they actually go through other cases that had similar situations with multiple patents, multiple products, and they said you could have grabbed one product or one group of products that practiced all three patents and told us what the investments were for that group of products, which I guess the analogy would be with their 14 products in the middle. And they said Zircon didn't do that. They also pointed out cases where you have investments traced to products in different groups that reach out to different patents, and they said you didn't do that one either. So they kind of wrote a little treatise on how to approach these multi-patent cases, and they basically, the lesson out of it is, the complainant is pretty free to organize its evidence as long as you can take the products, the expenses for the products, and trace them back in some meaningful way to determine whether there's an investment for the patent. And that's the problem is when you lump all the numbers together, as they said, we can't tell if it's 90-10 one way or 10 or 90 the other, and we can't make a qualitative analysis. And I don't think there's any expectation the commission should be the one pulling out the calculator for that. Do you want to address obviousness? Absolutely, but one more point on domestic industry. There is a federal circuit case I think is relevant and worth reading, and it's the John Metzalingua case, and that is on page 19 of our brief. And it's not directly on point, but it's pretty close. It's a case where utility patents and design patents were involved. And they said the complainant had failed because they had the burden of proof on the allocation of issue. And they did not identify how much of its investment in research and development related to the design patent protected by the 539 design patent as opposed to the 509 family more generally. So that is a case where this court has looked at it and said, if you've got multiple patents, you really do need to split this out. In this case, it was more about how much R&D did you do on design patent ornamentation as opposed to your other patents, which is quite analogous to here. How much R&D or investment or work did you do on auto recalibration versus the others? Let me ask you, if you're moving on now to the patent, let's focus on the 771 patent claims 13 through 15, which the ALJ and then ultimately the commission said was not proved up because of the failure to establish the means plus function sufficient, not sufficient evidence on means plus function is the way I think I read that. Yes. There's a stipulation as to what the gripping means. Correct. And there is an answer to question 90 that Mr. Delman gives, and I can't see any breathing room between the two. The stipulation says gripping means is a means plus function structure as a pair of concave finger holds positioned at opposite sides of the grip as disclosed in the specification and equivalence thereto. Right. And he testifies in his answer, each of the Stanley products has a grip located on their housing designed for a user to hold the tools. Their grips are comprised of two recessed three-dimensional depressions located at opposite sides of and curving inward from the surface of their housing, which serves as features for fingers to hold. Isn't that saying exactly what the stipulation says that claim limitation means? No, because the stipulation also included all the citations to all the disclosure in the specification of the drawings. And my understanding of the way ALJ was saying, what you didn't do is go into the specification. And if you look at the specification, they're very, how would I say these kind of, they're very dented finger holds. They're really almost shaped like the tip of a finger. And what you didn't do is you didn't go into the specification. None of this appears in the ALJ's opinion, which is very short on this point. Right. This is all coming from you as attorney argument as far as I can see. What I would say is what the ALJ did is he faulted both parties on that front because the Zircon One also had very similar finger holds that you could put two fingers into. And that may well be, and we can talk about whether if you lose on this, you're entitled to make an argument that you really should still win on anticipation from Zircon One. That is our position. That's a procedural problem, which it's not entirely clear to me at least, which is how we would get there. But as to this language, it is very hard for me to see what the difference is between what the gentleman is saying and what the stipulation is. Are you saying he needed to put in citations to the specification, which were cited, by the way, on the stipulation? The stipulation included all this. Right. The stipulation included references to the figures, references to citations and specifications. Which is to say that the language of the stipulation is exactly what the specification is saying. So that if he is saying what the stipulation is saying and the stipulation is saying what the specification says, then logically he's saying what the specification is saying. I believe what the ALJ says is that he did not compare the corresponding structure. He didn't roll up his sleeves. So if you were to look at, for example, the first page of the 771 patent, the very front, APPX, it's page 136 of the appendix. And that is a very different finger hold than either the Zircon 1. It's a very different finger hold from the Stanley product. And I think what the ALJ is saying is the corresponding structure is this thing that they drew and this thing that they described. And just reciting things like it has finger holds that you can grip, those words are already in the claim. He's saying what you didn't do is go in and you agreed upon these cited passages of the specification. They have meaning. We didn't feel that it was necessary in the stipulation to repeat all those passages in the stipulation. The idea was the expert has to go in to do the infringement analysis and look at these drawings and make the comparison because they're very different figures. So let me just ask a question that we alluded to earlier. How do you, not having, there wasn't a cross appeal in this case, so how do we reach the question of validity assuming we find that the ALJ and the commission were wrong in their assessment of the proof on 771.13-15, how do we get to the question of validity? It's an independent reason for reversal. Actually, cross appeal would have been inappropriate because it would not have affected the scope or outcome of the judgment. That's an interesting question because in a district court you would be dead wrong in making that argument because the scope of relief on invalidity is broader than the scope of relief for non-infringement. Your argument, I take it inferentially, is that in the commission because the only relief is an exclusion order that it comes out the same way. But there's a potential collateral estoppel effect from a judgment on invalidity that would be broader than a judgment on non-infringement. So why doesn't that require a cross appeal? We did look into that. We actually did look into that extensively and what we found was federal circuit cases frowning on this being a cross appeal issue because it would get you more, people strategically used to get more page space and things of that nature. And we looked at it and said it's an independent reason to affirm the judgment below. Any one of those cases is an ITC case? I can double check that. I can tell you that the law is perfectly clear that if you have non-infringement and invalidity then you can't go from non-infringement to invalidity without a cross appeal. You would agree to that. No, I honestly would. You don't. I would because these turn on the same issue. Setting aside ITC cases, you don't agree with that in the context of a district court appeal? That you can lose on invalidity when on non-infringement and then in the court of appeals you get to come back without a cross appeal and argue invalidity? I believe in the district court you're right. I believe that's right because the judgment says the patent is invalid. I misunderstood. I believe you're right about that. You have a commission case that stands for the proposition that in that setting you don't need to cross appeal. I am looking in my brief. I do know I have a footnote on this. The only thing you cite is the Dart case. I believe that's right. Right. And that is a district court case. And it doesn't stand for the proposition that you're arguing for. Right. What I believe is that we have an independent reason for affirming simply because of the scope of the judgment below. Can I take you back real quick to the infringement question? Have we ever held that in order to prove infringement of a means plus function you have to take the extra step of tying the evidence back to the specification? That is, if you in sum and substance as an expert say all the words that would describe an embodiment expressly disclosed in the specification, do you also have to take that last step and say and it looks just like figure whatever or it looks just like the specifically disclosed? I don't think it has to be like a design patent analysis where you compare the pictures, but you do have to look at the disclosed embodiment. I think the problem is the words that were in that stipulation were essentially words identifying things that were in the claim, right? Depressed finger holds and it's as shown in and described in. It's a short form for the specific embodiment that's in the application which were really designed to hold one finger as opposed to the products that both in validity and anticipation they were large, as he did earlier, multi-fingered grips. And there was no comparison about why these single dents that are designed to hold one finger would be equivalent. And that's what we're saying is you've got to look at the specific style. And that's the statute, the corresponding structure in the disclosed specification. I believe the answer to your question is yes. Thank you, counsel. I think we have had your argument. Mr. Hutchins, take three minutes. Thank you, Your Honor. I'll try to make a few points in reverse order. It's our position that there would have had to be a cross appeal or some sort of contingent cross appeal raising those other issues. That was not made here. So we think that it would be inappropriate for you to rule on the infringement side to give a remand on the validity side where that has not been appealed. Not understanding that the judgment in the ITC would be exactly the same, which is no exclusion order. Correct. And I'm unaware... Why would that not distinguish the ITC case from a district court case where the effect of the decision would be much broader if you have an injunction or a declaratory judgment of invalidity? Well, so I haven't given thought to that specific question. All I can say is that I'm unaware of any case making that distinction at the ITC. All I'm aware of are the cases that would have required a cross appeal. And it was not argued here that as an alternate ground of affirmance, that really, I would submit, wasn't pressed. All that was said was, if you're going to rule against us on that, let us make the argument down below rather than arguing to this court here that they should look at that argument and come to their own conclusions on it as an alternate ground to affirm. At this court, I think that's a little different, which was not done here, rather than simply saying, well, let me have another chance below even though I didn't appeal. Two quick points in reverse. I'm sorry? Yes, yes, I'm sorry. Let me move on. With respect to the means plus function question that Judge Stark raised, we're also unaware of any case specifically requiring magic words that relate back to 112.6 or specific portion of the specification as opposed to, as you said, in sum and substance describing... they're drawn in one way and no one ever says, that's what I see in the accused products. This is, I believe, straightforward enough that this is an instance of plainly putting semantics over the substance of the testimony. If you look at what the testimony was and you look at what the construction was, I think it absolutely is fair to say that there was evidence of the corresponding structure. It has to be corresponding or equivalent. Or equivalent, of course. Last point, just to clarify. Exhibit 28C wasn't the evidentiary record. It was put in the first day of trial through Mr. Bork's witness statement. It was cross-examined on during the trial. And it does provide revenue on a product-by-product basis. But here, remember, costs were allocated based on revenue, which is absolutely an appropriate, well-accepted way to allocate costs. So I respectfully disagree with my brother counsel that you couldn't very readily look at the DI products in that exhibit 28C, which were actually highlighted as such on a patent-by-patent basis. Simply add up the numbers and you would know the percentage allocation. Unless your honors have any further time, I appreciate the extra equipment. A quick record-related question. On question 90, there are some references to CPX and that includes CX. 61C, 62C, 63C, and 64C. I couldn't find those in the appendix. Do you know what those are? One second. This is a question and answer 90, which is at 14451 of the appendix. Yes, those are user manuals. Okay, that's all I need to know. Thank you. Thank you, Your Honor. Thank you, counsel. Cases submitted.